## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE:<br><br>PANTHERA ENTERPRISES, LLC,<br><br>Debtor.<br><br>PANTHERA ENTERPRISES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>PANTHERA TRAINING, LLC,<br><br>Defendant. | Bankr. Case No. 19-00787<br><br>Chapter 11<br><br>A.P. No. 2:19-ap-51 |

### PLAINTIFF'S PRE-TRIAL MEMORANDUM

Panthera Enterprises, LLC (the "Debtor" or "Plaintiff"), by and through its undersigned counsel, Bernstein-Burkley, P.C., hereby files this Pre-Trial Memorandum and states as follows:

### I.   BACKGROUND

#### a.  The Lease

The Plaintiff owns the real property located at 2506 Fishpond Road, Old Fields, West Virginia, 26845 (the "Real Property"), including the improvements, structures situated thereon and various personal property (the "Personal Property"), all of which is utilized as a training facility for various of the Plaintiff's clients and customers (the "Facility"). (Complaint, Docket No. 1) The Real Property, Personal Property, and Training Contracts (defined below), along with any and all assets, rights, title or interests of the Debtor, as broadly defined as property of the estate under 11 U.S.C. §541, is hereafter collectively referred to as the "Property." On or about June 1, 2018, the Plaintiff and Panthera Training, LLC (the "Defendant") entered into a

commercial lease (the "Lease") by which the Defendant was to occupy the Real Property and the Facility (collectively referred to as the "Leased Premises") and conduct certain trainings (the "Trainings") to fulfill contracts held by the Plaintiff (the "Training Contracts"). (Complaint, Doc. No. 1) (The Lease to be submitted at trial is incorporated herein as Pl.'s Ex. A). The Plaintiff has an active Training Contract pursuant to which it is scheduled to provide Training to the DEA beginning on December 14, 2019.

The Plaintiff agreed to subcontract certain of the work under the Training Contracts to Defendant, at Plaintiff's sole discretion, to allow the Defendant to conduct the Trainings during the time that the Defendant was leasing the Property (the "Subcontract"). (Complaint, Doc. No. 1) (The Subcontract to be submitted at trial is incorporated herein as Pl.'s Ex. B).

Pursuant to the Lease, the Defendant is required to pay fifty-two thousand dollars and 00/100 ($52,000.00) per month in "base rent" to Plaintiff. (Pl.'s Ex. A at 2). The Lease also requires the Defendant to pay "Additional Rent" on the first day of each calendar month in an amount to be determined by and based on the Defendant's profit and loss statement for each calendar month. (Pl.'s Ex. A at 2). The Lease defines "Additional Rent" as "an amount equal to fifty-percent (50%) of the Tenant's prior month's Profit." (Pl.'s Ex. A at 2). "Profit" is defined in the Lease as the "amount calculated monthly that is equal to the Tenant's Taxable Income derived from the Tenant's operations conducted on the Property in the ordinary course of business, reduced by the amount of $25,000 per month…" (Pl.'s Ex. A at 2). The Lease provision regarding Additional Rent also provides a detailed hypothetical illustration of how Additional Rent is to be calculated on a monthly basis to eliminate any possible confusion in determining how much Additional Rent the Defendant is to pay to Plaintiff on the first of each month. (Pl.'s Ex. A at 2). As an example, the Taxable Income from Defendant's operations on

the Property for the month of October, 2018 was $129,348. (Pl.'s Ex. E) After a reduction of $25,000.00, the remaining amount of Taxable Income is $104,348. Pursuant to the terms of the Lease, Defendant was therefore required to pay Plaintiff $52,174 (half of $104,348) in Additional Rent for the month of October, 2018.

Based upon its own financial records, the Defendant owes Additional Rent to the Plaintiff for the months of October 2018, November 2018, December 2018, April 2019, May 2019, and June 2019 in the total amount of $218,469.00. Said amounts due are calculated directly from the Defendant's profit and loss statements as submitted to Plaintiff for such months. (The subject profit and loss statements to be submitted at trial are collectively incorporated herein as Pl.'s Ex. E). In direct violation of the Lease, the Defendant has refused to provide the Plaintiff with its profit and loss statements for July 2019 through September 2019. Therefore, Plaintiff has been unable to determine the amount of Additional Rent that it is owed from Defendant for this period of time, but believes that significant amounts may be due for those months.

The Lease provides that the Defendant's failure to pay base rent or Additional Rent as required by the lease is an Event of Default. (Pl.'s Ex. A at 4). Further, because "the [Defendant's] Event of Default involves nonpayment of rent and Tenant fail[ed] to cure such default within ten (10) days of its due date," the Plaintiff may pursue any of the remedies set forth in the Lease. (Pl.'s Ex. A at 4). One such remedy provided by the Lease is the ability of the Plaintiff to terminate the Lease and, "with or without terminating this Lease, [Plaintiff] may re-enter, terminate [Defendant]'s right of possession, and take possession of the Property." (Pl.'s Ex. A at 4).

Because the Defendant failed to cure its default involving the nonpayment of Additional Rent within ten days of October 1, 2018 (the first due date of the missed Additional Rent

payment), the Plaintiff has had the right to terminate the Lease, re-enter, terminate Defendant's right of possession, and take possession of the Property since October 11, 2018.  On October 3, 2019, the Plaintiff sent a letter to the Defendant notifying it of the Plaintiff's termination of the Lease pursuant to the remedies contained in the lease (the "Notice of Termination").  (The Notice of Termination to be submitted at trial is incorporated herein as Pl.'s Ex. C). This Notice of Termination to the Defendant demanded that the Defendant relinquish possession of the Property in accordance with Plaintiff's termination of the Lease. (Pl.'s Ex. C).  Defendant responded to the Notice of Termination by denying that it was in default under the Lease and refusing to return the Property to the Plaintiff.

The Notice of Termination also advised the Defendant of additional Events of Defaults under the Lease, including the Defendant's failure to pay certain taxes, failure to maintain or provide proof of adequate insurance over the Leased Premises, failure to provide Plaintiff with adequate and sufficient records and/or an accounting as required by the Lease, and diversion of certain revenues derived from lodging related services (the "Additional Events of Default"). (Pl.'s Ex. C). The Lease provides that "Tenant shall be responsible for the timely payment of real and personal property taxes assessed on the Property, pro-rata for the term of this Lease.." (Pl.'s Ex. A at 8).  The Lease further provides that "Tenant shall, during the term of this Lease, and at Tenant's expense, maintain in full force and effect comprehensive general liability insurance with limits of $2,000,000 per occurrence, and $2,000,000 in the aggregate, which insurance shall contain an endorsement recognizing and insuring any liability accruing to Tenant under the first sentence of this paragraph, and naming Landlord, its subsidiaries and principals as additional insured." (Pl.'s Ex. A at 9)  (Copies of the relevant outstanding tax and insurance statements and invoices to be submitted at trial are incorporated herein as Pl.'s Ex. F and G).

These Additional Events of Default required the Plaintiff to give the Defendant thirty days' notice before terminating the lease on these bases. On November 11, 2019, the Plaintiff sent the Defendant a second letter (the "Notice of Additional Events of Default") within which the Plaintiff explained that the while the Lease was already terminated pursuant to the Notice of Termination, such Additional Events of Defaults, for which the Defendant had then received thirty days' notice of as a result of the notice provided in the Notice of Termination, provided further bases for the termination of the Lease. (The Notice of Additional Events of Default to be submitted at trial is incorporated herein as Pl.'s Ex. D).

Defendant has failed to cure the additional events of default within thirty days' notice, further supporting Plaintiff's right to terminate the Lease and retake possession of the Property.

### b. Procedural History

On September 13, 2019, the Plaintiff filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") in the Northern District of West Virginia (the "Court") at case number 19-00787 (the "Case").

On October 17, 2019, because Defendant wrongfully refused to turnover property of the estate, the Plaintiff filed an adversary complaint (the "Complaint") in the Case at Adversary Proceeding Number 19-00051 (the "Adversary Proceeding") for the turnover of the Plaintiff's Property and for a preliminary injunction for immediate possession of the Property.

On October 18, 2019, Defendant filed a "motion to compel" the Plaintiff to perform all obligations under the Subcontract (the "Motion to Compel").

On October 28, 2019, the Court held a telephonic hearing in the Adversary Proceeding to preliminarily consider the Motion to Compel. As a result of this hearing, the Court scheduled an

evidentiary hearing on November 21, 2019 (subsequently rescheduled for November 25, 2019) and entered an order (the "Order") requiring both the Plaintiff and Defendant to file a prehearing memorandum by November 18, 2019. The Plaintiff files this memorandum pursuant to the Order.

Further pursuant to the Order, on November 7, 2019, Plaintiff filed its Motion for Temporary Restraining Order and for Preliminary Injunction seeking the relief to which this memorandum relates.

Also, at the October 28, 2019 hearing, it was acknowledged that the relief sought in the Motion to Compel was improperly brought as a motion rather than as an adversary proceeding as required by applicable Rules of Bankruptcy Procedure. Defendant was graciously permitted the opportunity to re-assert its request for relief as a counterclaim in its Answer to the Complaint. On November 7, 2019, Defendant filed its Answer and Counterclaims to the Complaint, in which it re-asserted its request to "compel Plaintiff to comply with the Subcontract." Importantly, although couched as a request to "compel compliance," Defendant's request is nothing more than a claim for the payment of money that Defendant alleges to be due. The idea that such a request for money damages is appropriate for or justifies injunctive type relief, is completely without merit. In fact, as discussed below, one of the key factors used to determine when injunctive relief is not warranted is when the alleged harm can be remedied with money damages.

II.     **LEGAL ARGUMENT AND CITATION OF AUTHORITIES**

   a.  **All four requirements for granting a preliminary injunction are met.**

A preliminary injunction should be granted in favor of the Plaintiff and against the Defendant to prevent the Defendant from continuing its refusal to turnover property of the estate

and ordering Defendant to immediately relinquish and turnover the Property and all related rights to Plaintiff.

A plaintiff seeking a preliminary injunction must make a clear showing that: (i) the plaintiff is likely to succeed on the merits; (ii) the plaintiff is likely to suffer irreparable harm in the absence of a preliminary injunction; (iii) the balance of equities between the parties tips in favor of the plaintiff; and (iv) a preliminary injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) (setting forth these four factors); *Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds,* 559 U.S. 1089, *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010).

Additionally, the Fourth Circuit Court of Appeals has explained that the balancing of the irreparable harm to the Plaintiff without an injunction with the harm to the defendant if such injunction is granted is the most important consideration and should be considered by the court first. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812-13 (4th Cir. 1991). Further, where the plaintiff can show that it is more likely to experience irreparable harm in the absence of such injunctive relief, "the plaintiff need not show as robust a likelihood of success on the merits." *Id.* at 813 (quoting *Benda v. Grand Lodge*, 584 F.2d 308, 315 (9th Cir. 1978), *cert denied*, 441 U.S. 937 (1980)).

### i. *The Plaintiff is likely to succeed on the merits.*

Plaintiffs seeking injunctions must make a "clear showing" that they are likely to succeed at trial, but "plaintiffs need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). Based upon the facts as set forth above and the analysis below, the Plaintiff is likely to prevail on the merits.

11 U.S.C. § 542(a) regarding the turnover of property of the estate provides as follows:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. 542(a). "Property of the estate" is defined as "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

Due to Defendant's pre-petition failure to pay the Additional Rents under the Lease and the Plaintiff's subsequent termination of said Lease, the Plaintiff is likely to prevail on the merits. The Lease provides for the termination of the Lease upon Defendant's failure to pay rent. (Pl.'s Ex. A at 4).  The Lease clearly and specifically requires the payment of Additional Rent for every calendar month in which the Defendant realizes Profit (Pl.'s Ex. A at 2) and further makes clear that non-payment of any rents due under the Lease is an Event of Default (Pl.'s Ex. A at 4). Further, the Lease clearly provides that if an Event of Default involving the non-payment of rent is not cured within ten days of the due date of such payment, the Lessor (the Plaintiff) may terminate the Lease. (Pl.'s Ex. A at 4).  While other Events of Default require a thirty-day notice of such default in order to terminate the Lease, the Lease does not require any such notice period for the termination of the Lease caused by non-payment of rent. (*Id.*). Instead, the Lease unambiguously allows for the Plaintiff's termination of said Lease and the Plaintiff's subsequent possession of the Property upon the passing of ten days from when the payment was due. (*Id.*).

In addition to the Notice of Termination sent by Plaintiff to terminate the Lease, the Plaintiff sent the Notice of Additional Events of Default to the Defendant indicating that the thirty-day notice period, as required by the Additional Events of Default, had run without the Defendant's cure of such Additional Events of Defaults and the Additional Events of Default therefore became further bases for the termination of the Lease. (Pl.'s Ex. D).  The Plaintiff has

exercised its rights under the Lease to terminate said Lease pursuant to the Notice of Termination and the Notice of Additional Events of Default.

As set forth in both the Notice of Termination and the Notice of Additional Events of Default, Plaintiff rightfully terminated its Lease with the Defendant. Further, since the Plaintiff's right to terminate the Lease existed prior to the petition date as the defaults arose prepetition so that the right to terminate the Lease, and thus the right to possess the Property, were interests held by the Debtor as of the commencement of the Case and are therefore property of the estate. As such, the Defendant is required to turnover the Property pursuant to 11 U.S.C. § 542(a) and the facts clearly show that the Plaintiff is likely to succeed on the merits.

### ii. The Plaintiff is likely to suffer irreparable harm in the absence of a preliminary injunction

If the preliminary injunction is not granted, the Plaintiff will suffer irreparable harm arising from its inability to perform the necessary Trainings on the Property. This harm will be detrimental to the Plaintiff's ability to obtain Training Contracts in the future.

The Plaintiff is only required to show a *likelihood* of irreparable harm to satisfy this second element of the preliminary injunction standard. *See Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.,* 452 Fed. App'x 351, 354 (4th Cir. 2011). If the alleged harm could be remedied by money damages, then such damages typically do not amount to "irreparable harm." *Id.* 353. Courts have found that harm to a party's business reputation and the possible permanent loss of customers that would occur absent a preliminary injunction satisfies the irreparable harm factor. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 552 (4th Cir. 1994). The irreparable harm to the party moving for a preliminary injunction must also be immediately present. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d

802, 816 (4th Cir. 1991) (finding that where the potential harm was "at least a year" away, there was no immediate threat of irreparable harm which would warrant a preliminary injunction).

If the Court does not grant the preliminary injunction in favor of the Plaintiff, the Plaintiff will remain unable to access its Property and will be unable to conduct the necessary Training as required by the Training Contracts. The Plaintiff is the named party to the Training Contracts and is therefore primarily obligated to fulfill the obligations under those contracts. Any failure to perform the duties under those contracts will severely harm the Plaintiff's business reputation and its ability to obtain such contracts with customers in the future. This type of harm cannot be remedied by monetary damages. Additionally, the potential harm to Plaintiff is imminent; pursuant to one of its Training Contracts with the DEA, Plaintiff is to provide a Training on the Property beginning on or around December 14, 2019. James Punelli, a managing member of the Plaintiff ("Punelli"), will testify as to this potential harm.

Because the potential harm to the Plaintiff constitutes harm to its business reputation and has the possibility of causing the permanent loss of the Plaintiff's customers if contractual obligations are not fulfilled, the Plaintiff may suffer irreparable harm as early as December of 2019 if the preliminary injunction is not granted. Furthermore, if the preliminary injunction is not granted, the Plaintiff will be severely prejudiced in its ability to generate new customers and new training contracts which are necessary to the Plaintiff's ongoing viability as a going concern and its ability to reorganize in this bankruptcy proceeding. As such, the "irreparable harm prong" is satisfied.

### iii.  *The balance of equities weighs in favor of the Plaintiff*

In determining whether to grant a preliminary injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief." *Winter,* 555 U.S. at 24 (internal citation omitted).

If the Plaintiff is not permitted to retake possession of the Property, the Plaintiff will be unable to guarantee the completion of its obligations under the Training Contracts and will therefore face a potential permanent loss of existing customers and attendant harm to its business reputation. Such irreparable harm will severely hinder the Plaintiff's ongoing viability as a going concern, its ability to successfully reorganize and the Plaintiff's estate and its creditors.

If a preliminary injunction is granted, the only potential harm to the Defendant is the loss of revenue remaining under the current term of the Subcontract. To the extent that any such potential harm exists, which the Plaintiff denies, that potential harm may be remedied by monetary damages. However, the Subcontract also provides that the Plaintiff may cease assigning work to Defendant under the Subcontract at any time and at Plaintiff's sole discretion. (Pl.'s Ex. B. at Section 1.4). Accordingly, Plaintiff has the ability to terminate Defendant's work under the Subcontract in any event, in which case Defendant will have no expectation of future revenue under the Subcontract.

The Subcontract is also an executory contract, subject to 11 U.S.C. § 365. Section § 365 provides in pertinent part that, subject to court approval, debtors may "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Plaintiff intends to reject the Subcontract if that becomes necessary. Therefore, any alleged potential harm to the Defendant that might be caused by the granting of Plaintiff's preliminary injunction is not irreparable harm, as it may be remedied by money damages. Furthermore, any alleged harm to Defendant caused by loss of revenue under the Subcontract is not uniquely caused by an injunction because the Plaintiff's ability to terminate or reject the Subcontract would result in the

same outcome as to Defendant, notwithstanding any injunction that may be entered in this matter.

If preliminary injunctive relief is not granted in favor of the Plaintiff, the harm it will suffer will be severe and irreparable. By contrast, any potential alleged harm (if any) to the Defendant can be remedied by money damages. Therefore, the balance of equities weighs in favor of granting the preliminary injunction in favor of the Plaintiff.

### iv. *The injunction does not have an impact on the public interest*

The final showing that a party must make before a court grants a preliminary injunction is that the granting of such relief is in the public interest. *See Winter,* 555 U.S. at 32; *Pashby*, 709 F.3d at 320. Where there are no relevant concerns implicating the public interests other than upholding the laws and/or regulations, the public interest may best served by following whichever way the court comes out on the likelihood of success on the merits. *See Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1338 (Fed. Cir. 2013) (finding that the patents were likely valid and infringed upon, such that Apple was likely to succeed on the merits, and because there were no other relevant concerns, the public interest was best served by granting a preliminary injunction); *Abbott Labs v. Andrx Pharms., Inc.,* 452 F.3d 1331, 1348 (Fed. Cir. 2006) ("[a]lthough the public interest inquiry is not necessarily or always bound to the likelihood of success o[n] the merits, … absent any other relevant concerns … the public is best served by enforcing patents that are likely valid and infringed")

There are no matters of public interest that will be impacted if the preliminary injunctive relief requested by the Plaintiff is granted. The Defendant claims that if injunctive relief is granted "the December DEA Course will not occur, and DEA employees will not receive critical tactical skills in preparation for employment or other activities as scheduled," (Answer, Do. No.

10, at ¶ 74). This allegation is false. As set forth above at length, the purpose of Plaintiff's requested preliminary injunction is to allow the Plaintiff to possess the Property and fulfill the obligations under various Training Contracts, including providing the training for the DEA Course in December. If the Court wishes to inquire, Punelli is prepared and able to testify as to the Plaintiff's intention and ability to complete the training for the DEA Course.

Defendant also argues that the public interest favors parties abiding by their contractual responsibilities. (Answer, Do. No. 10, at ¶ 74). Plaintiff does not dispute this and instead points to the language in the Lease, which required Defendant to take certain actions that Defendant failed to comply with as fully set forth above in Section II.a.i of this Memorandum. As a result of Defendant's failure to comply with the terms of the Lease, Plaintiff rightfully terminated the Lease. Therefore, because of the Defendant's various defaults under the Lease and Plaintiff's termination of the Lease, Defendant is now contractually obligated to relinquish possession of the Property to Plaintiff. (Pl.'s Ex. A at 4)

There are no relevant public concerns related to the granting of a preliminary injunction apart from requiring Defendant to abide by its contractual responsibilities. Thus, the public interest factor weighs in favor of granting the Plaintiff's preliminary injunction because Plaintiff has shown that it is likely to obtain success on the merits in this matter. *See supra* Section II.a.i.

### b. Defendant's Claim that Plaintiff lacks the ability to perform under Training Contracts is Irrelevant in Determining whether to Grant a Preliminary Injunction

The scope of the evidentiary hearing scheduled for November 25, 2019 is limited to the consideration of the preliminary injunctive relief requested. (Order, Doc. No. 5), This Court's decision whether to grant such relief will be based upon the Plaintiff establishing that (i) the plaintiff is likely to succeed on the merits; (ii) the plaintiff is likely to suffer irreparable harm in

the absence of a preliminary injunction; (iii) the balance of equities between the parties tips in favor of the plaintiff; and (iv) a preliminary injunction is in the public interest. *See Winter*, 555 U.S. 7 at 20.  The Defendant has, without any evidence whatsoever, suggested that the Plaintiff is not able to resume its obligations under the Training Contracts, the types of contracts that the Plaintiff serviced and performed under for years prior to subcontracting those responsibilities to the Defendant.  The Plaintiff's readiness and ability to service the Training Contracts is completely irrelevant to the issues before this Court on November 25, 2019, namely: (a) whether the Defendant is in breach of the Lease; (b) whether the Plaintiff is entitled to possession of the Property as a result of those breaches; and (c) whether the Plaintiff has met the evidentiary standard for preliminary injunctive relief in the form of an Order granting it immediate possession and control of the Property.  To the extent that the Court requires additional information, Plaintiff avers that it is fully ready, willing, equipped and capable of performing all scheduled trainings to the same high-quality standard as it did prior to subcontracting with the Defendant.   Punelli is able to advise the Court on this issue if necessary.

### c. Additional Response to Defendant's Request for Injunctive Relief

In addition to the portions of Defendant's request for injunctive relief discussed above, Plaintiff hereby further responds to various glaring flaws in Defendant's request.

First, after setting forth and acknowledging the appropriate standard for consideration of a request for preliminary injunction, which includes an analysis of the "balancing of the harms" between the parties, Defendant alleges no facts and sets forth no reasoning or even argument on this key factor.  In fact, other than acknowledging the need to establish this factor, Defendant fails to even mention it in its purported argument.  Accordingly, Defendant's request for relief is insufficient on its face and in fact fails to even state a claim for injunctive relief.

Second, Defendant bases its entire argument under the first prong for injunctive relief (likelihood of success on the merits) on its complete misunderstanding of the nature and legal effect of a security interest. Defendant's whole argument is that the Debtor does not have the authority to enforce the Lease because the Debtor assigned all of its rights under the Lease to the West Virginia Economic Development Authority ("WVEDA"). Notably, not even the WVEDA itself was willing to assert such an unfounded and preposterous position on the record in this case. Regardless, Defendant's characterization of the subject Collateral Assignment of Leases and Rents is entirely incorrect and misleading.

The Assignment of Leases and Rents is a security agreement pursuant to which the Debtor granted a security interest to the WVEDA in the Debtor's leases and rents derived therefrom. This is a standard security agreement document that routinely accompanies a mortgage on commercial property. The WVEDA did not exercise its rights pre-petition as a secured creditor under the Assignment of Leases and Rents and, conveniently, Defendant does not mention this fact. Accordingly, Defendant's entire argument under the first prong of the required injunctive relief analysis is wholly flawed and without merit.

Third, as noted briefly above, although couched as a request to "compel the Debtor to timely perform its obligation under the Subcontract", Defendant's request for injunctive relief is nothing more than a claim for the payment of money that Defendant alleges to be due. Defendant has continually alleged that, upon execution of the Subcontract, the Plaintiff had no obligations other than to submit invoices and forward payment to Defendant if received. Accordingly, by Defendant's own characterization of Plaintiff's obligations under the Lease and/or Subcontract, Defendant is only seeking relief related to the payment of money that Defendant alleges to be due. The idea that a request for money damages is appropriate for, or justifies, injunctive-type

relief, is completely without merit. In fact, as discussed above, one of the key factors used to determine when injunctive relief is not warranted is when the alleged harm can be remedied with money damages. Accordingly, Defendant's request for injunctive relief under the circumstances and given the relief that Defendant is seeking is entirely inappropriate and unwarranted.

### III.     CONCLUSION

For the above referenced reasons, Plaintiff's request for a preliminary injunction enjoining the Defendant from unlawfully possessing the Property and ordering immediate turnover of the Property is warranted and should be granted.

Respectfully submitted:

Date: November 18, 2019

BERNSTEIN-BURKLEY, P.C.

By: /s/ John J. Richardson
John J. Richardson, Esq.
WV ID: 13140
jrichardson@bernsteinlaw.com
Robert S. Bernstein, Esq.
WV ID: 4708
rbernstein@bernsteinlaw.com
Mark A. Lindsay, Esq.
PA ID: 89487
Admitted Pro Hac Vice
mlindsay@bernsteinlaw.com
707 Grant Street, Ste. 2200
Pittsburgh, PA 15219
Phone: (412) 456-8101
Fax: (412) 456-8135

Counsel for Debtor/Plaintiff